

# OFFICE OF THE ATTORNEY GENERAL OF TEXAS

## AUSTIN

GERALD C. MANN
ATTORNEY GENERAL

Honorable George H. Sheppard
Comptroller of Public Accounts
Austin, Texas

Affirmed by √-1567

Dear Sir:

Opinion No. O-3627
Re: Construction of Article 16,
House Bill No. 8, Forty-
seventh Legislature, with
reference to what oil and
gas well services are taxa-
ble.

This is in reply to your letter, which reads as follows:

"Article 16 of House Bill No. 8 of the Forty-seventh Legislature provides for a tax of 2.2% on oil and gas well servicing, which sets out four types of operations; namely, cementing of casing seat of any oil or gas well; shooting or acidizing the formations of such wells; testing of the sands or other formations of the earth in any such oil or gas wells.

"Please advise me regarding the following questions:

"1. A party takes a contract from the operator to cement a well for a stipulated price (perhaps he uses 500 sacks of cement). Will he be permitted to deduct the cost of cement before computing the tax?

"2. There is a tool known as a 'cement packer' which is used in cementing liners in wells. This tool is leased or rented to the owner of the well or contractor for a fee of $12 per day operators time, plus car mileage to location and operator's expenses. Would the

COMMUNICATION IS TO BE CONSTRUED AS A DEPARTMENTAL OPINION UNLESS APPROVED BY THE ATTORNEY GENERAL OR FIRST ASSISTANT

Honorable George H. Sheppard, Page 2

party who receives rent for the 'packer' be
subject to the tax on the rental received or
rental plus expenses of the operator?

"3. A mechanical perforator is used in-
stead of a gun perforator. Will the tax apply
for such service?

"4. Acidizing - the contractor makes two
charges to the operator of a well; one, is for
the acid used; the other for the service ren-
dered. Will the receipts from both be taxable?

"5. A contractor takes a contract to clean
out an oil well, part of the work will consist
of acidizing or shooting. Will the receipts of
the entire job be taxable, or will the contractor
be permitted to make two separate billings and
tax accruing only on acidizing or shooting serv-
ice?"

The answer to some of your questions calls for the
determination of the meaning of certain words used in con-
nection with a particular trade, to-wit, the oil and gas
producing business. Article 10, sub-paragraph 1, Revised
Civil Statutes of Texas says:

"The ordinary signification shall be applied
to words, except words of art or words connected
with a particular trade or subject matter, when
they shall have the signification attached to
them by experts in such art or trade, with ref-
erence to such subject matter."

We realize that we are not experts in the oil and gas pro-
ducing business, and we hesitate to place a meaning on some
of the trade words involved in this opinion; but it is our
duty to advise you on the various legal questions that come
before you, and in our inexpert way we will proceed to do
our duty by answering your questions even though we must as-
certain the technical trade meaning of certain words.

The particular statute in question is paragraph
(b), Section 1, of Article 16, House Bill No. 8, Forty-seventh
Legislature, which reads as follows:

Honorable George H. Sheppard, Page 3

"'(b) Every person in this State engaged in the business of furnishing any service or performing any duty for others for a consideration or compensation, with the use of any device, tools, instruments or equipment, electrical, mechanical, or otherwise, or by means of any chemical, electrical, or mechanical process when such service is performed in connection with the cementing of the casing seat of any oil or gas well or the shooting or acidizing the formation of such wells or the surveying or testing of the sands or other formations of the earth of any such oil or gas wells, shall report on the 20th of each month and pay to the Comptroller, at his office in Austin, Texas, an occupation tax equal to two and two-tenths (2.2) per cent of the gross amount received from said service furnished or duty performed, during the calendar month next preceding. The said report shall be executed under oath on a form prescribed and furnished by the Comptroller."

The key word in this statute, in determining the answers to your questions, is "service". The persons taxed are those persons "furnishing any service or performing any duty . . . when such service is performed in connection with (1) the cementing of the casing seat of any oil or gas well or (2) the shooting or (3) acidizing the formations of such wells or (4) the surveying or testing of the sands or other formations of the earth in any such oil or gas wells", and the tax is "two and two-tenths (2.2) per cent of the gross amount received from said service furnished or duty performed". We think this is a tax on service furnished and duty performed.

In arriving at answers to your questions we want to point out that there is a distinction between a "sale" and a "service". Likewise there is a distinction between the phrase "materials furnished" and the phrase "services furnished."

This is a new statute, and therefore we are unable to find any appellate court case directly in point on this situation; but we do receive some help from the language of cases from other states construing what constitutes a

Honorable George H. Sheppard, Page 4

sale as distinguished from a service within the meaning
of sales tax laws.  In the case of Wiseman v. Gillioz,
192 Ark. 915, 96 S. W. (2d) 459, the Supreme Court of
Arkansas held that when a building contractor erected
a house under an agreement by which the contractor fur-
nished the material and labor for a given sum it consti-
tuted a sale of the materials, and that part of the sum
which was given in payment of the materials was subject
to the sales tax; and the court said:

> ". . . They say he does not sell the houses;
> that he constructs or erects them; and that he
> most certainly does not sell the lime, cement,
> lumber, and steel which he uses and consumes in
> fabricating the completed structure which he
> erects upon and under the owner's land.

> "Of course, one would not say that the
> contractor sold the house, but unquestionably
> he sells the material that goes into the house.
> If one should contract to furnish the material
> and labor and build a house for the owner, he
> would necessarily estimate or calculate the
> value of the material furnished and the owner
> would have to pay for it.  The contractor would
> sell this to the owner. . ."

A similar holding was made in the case of Fifteenth Street
Investment Corporation v. People, 81 Pac. (2d) 764, by the
Supreme Court of Colorado, in which the court said:

> "We cannot, as a court, be ignorant of
> what all men know: that a contract involving
> labor and materials which become a constituent
> part of an improvement, the ownership of which
> passes to the owner of the real estate, in-
> volves a transfer of title to the materials
> for a consideration.  That work and labor is
> to be done upon or in connection with the mater-
> ials as an incident to or in connection with
> the transfer of title to the materials, does
> not rob the transaction of its essential char-
> acteristics of a sale if the whole or any
> measurable part of the consideration for the
> performance of the contract is compensation
> for the materials. . . ."

Honorable George H. Sheppard, Page 5

An excellent discussion of whether a transaction is a sale or a service or a mixture of both is found in the case of Western Leather & Finding Co. v. State Tax Commission, 87 Utah 227, 48 Pac. (2d) 526, in which the Supreme Court of Utah held that when a shoe cobbler repairs a pair of shoes by sewing new leather on to the shoes it constitutes a sale of the leather and the cobbler's charge is not made entirely for services. The discussion in that case is so excellent that we quote at length from it as follows:

> ". . . If the charge made for repairing shoes constitutes a sale by the shoe repairer to the owner of the shoes of the materials used in the repair jobs, then and in such case under the express provisions of the act the plaintiff is not liable for the payment of the tax here sought to be imposed upon it. . .

> ". . . The mere fact that the leather and other materials here in question were used to make only a part of a shoe does not change the nature of the transaction. A 'sale of goods' is defined as 'an agreement whereby the seller transfers the property in goods to the buyer for a consideration called the price.' R. S. Utah 1933, 81-1-1. A sale is in effect so defined in the act here involved. When a shoe repairer delivers the repaired shoes to the owner thereof and receives payment therefor, the title to the materials used in the repair job passes to the owner. The amount paid includes the price of the materials used. Such a transaction possesses all of the elements of a sale of the materials used in the repair job. (Underscoring ours)

> ". . .

> "Wolfe, Justice (concurring specially).

> ". . .

> "The problem can be best approached by assuming extreme cases on both ends of the gamut. When a barber shaves a person, the lather and soap and soothing lotion which go upon the customer are mere incidentals as compared to the

Honorable George H. Sheppard, Page 6

service performed. It is likewise true of shoe
shiners. These illustrate cases on one end of
the gamut. Where a merchant sells readymade
clothing and in connection therewith does al-
terations and perhaps furnishes materials, such
as a small piece of cloth or thread, we have a
case in which the services are merely incidental
to the sale. Other cases lie in between. The
automobile repair shop furnishes parts as well as
services. The parts may at times amount to more
than the services and other times vice versa.
Some trades have long customarily separated their
charges for services and parts. The automobile
repair trade is an example. There it is quite
easy to make the separation because the parts are
usually very definite. In the shoe repairing
industry, on the other hand, the practice has
been just the opposite. A gross charge is made
without separation. Indeed, it might be diffi-
cult to make the separation in this trade because
of the difficulty of determining just how much
leather cut from a larger piece goes into each
job." (Underscoring ours)

Other sales tax cases that make similar holdings are Cusick
v. Commonwealth, 260 Ky. 804, 84 S. W. (2d) 14; Doby v. State
Tax Commission, (Ala.) 174 So. 233; Bigsby v. Johnson, (Calif.)
99 Pac. (2d) 268; and C. & E. Marshal Co. v. Ames, 373 Ill.
301, 26 N. E. (2d) 483.

The only Texas Appellate court case from which we
receive any help in deciding this question is the case of
Standard Oil Company of Texas v. State, 142 S. W. (2d) 519.
In that case the defendant contended that when automobile
tires, tubes, batteries or other accessories were installed
on an automobile and a single charge made for the transaction
that such a transaction was a "service" only and not a "sale"
so as to make the operation of the filling station where the
transaction occurred subject to the "chain store tax", but
the Court of Civil Appeals held that a "sale" of said arti-
cles took place, and it is evident that the court thought
that a part of the sum charged represented the sale price of
the article and the remainder represented the charge for the
service of installing the article.

The noun "service" is defined in Webster's New
International Dictionary, 2nd Edition, as follows:

Honorable George H. Sheppard, Page 7

"Performance of labor for the benefit of
another, or at another's command."

The foregoing dictionary definition and appellate
court cases show that there is a difference between furnish-
ing a material and furnishing a service. We are convinced
that the tax in question is a tax on the servicing of oil
and gas wells measured by the gross receipts derived from
"service furnished" in certain oil and gas well operations;
and it is not on the furnishing of materials to oil and gas
wells. Therefore, a party who cements a casing seat of an
oil or gas well for another person, and who furnishes the
cement for said operation, is entitled to deduct the cost of
said cement from his gross receipts before computing the tax.
Our answer to your first question is "yes".

We will now take up your second inquiry, which
deals with the furnishing of a "cement packer". Since re-
ceiving your request for this opinion, you have advised us
that this "cement packer" is "made up with and forms a part
of the liner before it is run into the well and this tool
remains in the well"; and you also advised us that the con-
cern furnishing the "cement packer" charges the owner of
the well "$12.00 per day operator's time plus car mileage
to the location and . . .. operator's expenses", and that
the operator "only installs the 'cement packer' and does
not have any part in the actual cementing operation."

We understand that the "cement packer" in question
is a device or material that is furnished in such a manner
that it becomes a part of the well. It is lowered into the
well and used there only for the purpose of cementing the
"liner", which is a particular type of short casing at or
near the bottom of the well. But, after the liner is cemented
the "packer" cannot be removed. (See "Petroleum Production"
by Wilbur F. Cloud, 1937, page 165, 169; "Elements of the Pe-
troleum Industry", edited by E. De Golyer, 1940, page 234;
and "Perforated Casing and Screen Pipe in Oil Wells", by E.
W. Wagy, U. S. Bureau of Mines Technical paper 347).

We are convinced that the "cement packer" in ques-
tion is a material furnished, and that the charge for the
same is for material furnished and not for a service furnish-
ed. However, that part of the charge that is made for the
furnishing of the operator is a charge for a service, the
service of installing the "cement packer". The fact that

Honorable George H. Sheppard, Page 8

part of said charge is based on car mileage and part on operator's expense does not prevent it from being a charge for a service. A person could hire a day laborer to perform some kind of service at $3.00 per day plus his traveling expense to and from the job each day (20¢ for car fare) and his actual expenses while on the job (45¢ for his noon day lunch), or a person could hire such a laborer for $3.65 per day, the laborer to pay his own traveling expense and other actual expense; and, it is our opinion that in either case all of the money received by the laborer would be compensation for services furnished.

Before giving our answer to your second question we want to again mention that the tax in question applies only when the service is performed in connection with one of four specifically named oil and gas well operations, to-wit, (1) "cementing of the casing seat," (2) "shooting," (3) "acidizing the formations," and (4) "surveying or testing of the sands." We have not been given any information showing that installing a "cement packer", or even cementing a "liner", is one of the four named taxable operations. If it is not one of those four operations the receipts therefrom are not to be considered in computing the tax.

The furnishing of the "cement packer" is the furnishing of a material, and the furnishing of the operator is a service furnished. Our answer to your second question is that if the furnishing and installing of the "cement packer" in question is one of the four taxable operations named in the statute, the charge for furnishing the "cement packer" should not be included in the receipts on which the tax is computed and the charge for furnishing the operator should be included.

We will now take up your third inquiry, which is in regard to mechanical perforators. We are advised that "perforating", as that term is used in the oil and gas producing business, is the operation of breaking holes through the walls of the casing in a well for the purpose of making communication into or out of the earth formation at that particular level. (See "Elements of the Petroleum Industry", edited by E. De Golyer, 1940, page 229) There are two ordinary methods of "perforating", to-wit, "gun perforating" and "mechanical perforating". Gun perforating is referred to in "Fundamentals of the Petroleum Industry", by Dorsey Hagar, 1939, at page 248, as follows:

Honorable George H. Sheppard, Page 9

"Gun Perforators. - A great improvement
in the technique of completing wells has re-
sulted from the development of the gun perfor-
ator. This device fires .45-caliber bullets
through the casing, and even through any cement
in back of it, and penetrates through to the
gas or oil zones."

The same authority at page 247 discusses mechanical perfor-
ating as follows:

"Perforations may also be made by lowering
a cutting tool, called a 'perforator,' in the
hole. This tool consists of a rolling knife
which is a star-shaped toothed wheel with cut-
ting points. After the casing is perforated,
the well is bailed to remove the sand, sludge,
and drilling water."

Your question apparently refers to this last mentioned
method.

As heretofore indicated the tax in question ap-
plies only when the service is performed in connection with
one of four specifically named oil and gas well operations,
to-wit, (1) "cementing of the casing seat", (2) "shooting",
(3) "acidizing the formations", and (4) "surveying or test-
ing of the sands".

After reading your written request for our opin-
ion and talking with you, we understand you have in mind
the question of whether the use of a mechanical perforator
constitutes "shooting".

We must give the word "shooting" the meaning that
is attached to it in the oil and gas producing trade. In
"Petroleum Production", by Wilbur F. Cloud, 1937, at pages
401 and 403, it says:

"Oil well shooting dates back to the time
when Colonel E.A.L. Roberts exploded eight pounds
of gunpowder at a depth of 453 feet in the Ladies
Well on Watson Flats near Titusville, Pennsyl-
vania, in January, 1865. During the latter
part of July, 1866, the Roberts Torpedo Company
was granted a patent covering this process of
increasing oil well production."

Honorable George H. Sheppard, Page 10

"At present there are three types of explosives used for shooting oil wells: liquid nitroglycerin, solidified nitroglycerin, and gelatin dynamite. Of these the liquid had been used most; however, the solidified form is safer and more variable in application and reaction."

"Oil well shooting is not practical in all oil fields; but is confined largely to wells or areas that produce from hard, compact, close-grained sandstones and limestones. Soft and unconsolidated rocks, which are typical of the Gulf Coast area and certain California fields, do not respond to shooting; and for that reason shooting is rather uncommon in those regions.

"Shooting oil wells for production may be done for one of several reasons: An apparently dry hole may have been drilled, and before the well is abandoned some operators may set-off a charge of nitroglycerin as a final effort toward bringing in an oil well. Also, in some wells when drilled into tight sands and hard limes, the reservoir rock may be only partly saturated with oil, and very little gas may be present. Frequently the shooting of such formations results in the completion of good commercial oil wells. Flowing wells are given light 'shots' of nitroglycerin, blasting wells are given light 'shots' of nitroglycerin, blasting gelatin, or glycerinite, to clean-out the well and fracture the sand face, thus prolonging the period of natural flow. Many old pumping wells are shot periodically to stimulate drainage into the well."

In "Fundamentals of the Petroleum Industry", by Dorsey Hagar, 1939, at page 235, it says:

"Shooting accomplishes several purposes, specifically, it

"1. Breaks up the sandstones or limestones, causing channels to form.

"2. Opens passages to fracture zones or to

Honorable George H. Sheppard, Page 11

joint planes in which oil may occur.

"3. Forms a larger collecting area.

"4. Creates more seepage space in the hole.

"5. Creates a vacuum that sucks in the oil, starting it through channels into the well."

In the case of Texas Granite Oil Company v. Williams, 199 Ky. 146, 250 S. W. 818, the court mentioned "shooting" of an oil well as follows:

"It is a matter of common knowledge that the shooting of an oil well is done always at a time when the well is at or near completion, or when the oil sand has been reached; the purpose being to loosen the formation to the end that the flow of oil may be increased."

We think that it is apparent that "perforating" an oil well is altogether different from "shooting" an oil well. Whether the "perforating" is done with a "gun perforator" or a "mechanical perforator", it does not come within the meaning of the term "shooting". Other authorities that support this conclusion are as follows: "Well-shooting with Reference to Secondary Oil Recovery", by H. M. Ryder, Oil & Gas Journal ( May 6, 1937) 62; "Well Treatment after Perforating", by E. Bankis, Oil Weekly (March 28, 1938) 36, Oil & Gas Journal (March 31, 1938) 176; and "Gun Perforator Utilized in Samfordyce Field for Completion of Oil Wells", by T.P. Sanders, Oil & Gas Journal (July 23, 1936) 53.

We have gone to considerable length to show that "perforating" is not included in the term "shooting", and that it is not used in connection with said term, because we understand that a confusion of those terms gave rise to your question. Is the operation of "perforating" ever performed as a part of or in connection with any of the other taxable operations, to-wit, "the cementing of the casing seat", "acidizing the formations", or "surveying or testing of the sands"? From our study we have come to the conclusion that it ordinarily is not, but there may be some unusual instances in which it is performed in connection with one of said three operations.

Honorable George H. Sheppard, Page 12

Our answer to your third question is that the tax in question does not apply to the ordinary use of a "mechanical perforator", but it would apply if a "mechanical perforator" wereused in connection with one of the four taxable operations.

We will now take up your fourth inquiry, which concerns acidizing. In "Elements of the Petroleum Industry", edited by E. DeGolyer, 1940, page 225, it says:

"Acidization, in the oil industry, is the process of introducing acid into the pore space of an acid-soluble producing formation for the purpose of enlarging the pores by dissolving surrounding formation and thereby increasing the permeability of the 'pay' around the well bore. This method of enhancing the producing ability of certain oil-producing strata applies principally to the acid-soluble reservoir rocks, such as limestone and dolomite, but occasionally it is used in sand formation to dissolve cementing materials. . ."

We believe the same reasons apply in answering this question that apply in answering your first question, which concerns cement. As heretofore pointed out, there is a difference between furnishing a material and furnishing a service. The furnishing of the acid is the furnishing of a material. The tax is only on the servicing of oil and gas wells, and it cannot be calculated on the receipts derived from furnishing materials. Our answer to your fourth question is that a party who acidizes a well for another, and furnishes the acid, is entitled to deduct the cost of said acid from his gross receipts before computing the tax.

We will now take up your fifth inquiry, which concerns cleaning out an old well. As we have stated so many times before in this opinion, the tax in question applies only when the service is performed in connection with one of the four oil and gas well operations specifically named as taxable in the statute. "Shooting" is one of those operations, and "acidizing" is another, and therefore the receipts from "shooting" and "acidizing" are taxable.

Honorable George H. Sheppard, Page 13

The other two taxable operations are "cementing of the casing seat" and "surveying or testing of the sands." As we view it, when a well is cleaned nothing connected with those two operations would ordinarily be done; but, it might be possible that in rare instances something would be done in connection with those two operations when a well was cleaned.

Our answer to your fifth question is that when a contractor cleans out a well, the receipts for the services furnished in connection with the "shooting" and "acidizing" are taxable, and the only other receipts taxable are those obtained from that part of the work done in connection with the other two taxable operations, to-wit, "cementing of the casing seat" and "surveying or testing of the sands."

We hope that the foregoing has answered your five questions.

Yours very truly

ATTORNEY GENERAL OF TEXAS

By _Cecil C. Rotsch_

Cecil C. Rotsch
Assistant

CCR:LM

APPROVED JUN 27, 1941

_Glenn R. Lewis_

Acting ATTORNEY GENERAL OF TEXAS



APPROVED
OPINION
COMMITTEE
BY
CHAIRMAN